# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ROBERTS,<br><br>                    Plaintiff,<br><br>vs.<br><br>VETERANS VILLAGE ENTERPRISES, INC., et al.,<br><br>                    Defendants. | CASE NO. 17cv524-LAB (MDD)<br><br>**ORDER GRANTING MOTION TO PROCEED *IN FORMA PAUPERIS* BUT REQUIRING SUPPLEMENTAL BRIEFING ON PLAINTIFF'S FINANCIAL STATUS;**<br><br>**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER TO MOTION FOR PRELIMINARY INJUNCTION** |

      Plaintiff Michael Roberts filed a complaint, a motion for temporary restraining order ("TRO"), and a motion to proceed *in forma pauperis* ("IFP"). He then filed three amendments to his TRO motion. The complaint alleges violations of the Fair Housing Act, the Rehabilitation Act of 1973, the False Claims Act, and also brings several state law claims. Roberts says he was not allowed to keep his service dog, Arthur, at the Veterans Village Enterprises home where he lives. He suffers from post-traumatic stress disorder (PTSD) and mobility problems, and a doctor recommended a service to assist him with PTSD.

**IFP Motion**

      Plaintiff's motion shows that he earns $587 a month, and that his expenses are nearly that amount. The motion's description of expenses seems to be a summary, though, with

categories like a cell phone, gasoline and dog food accounting for about 60 to 80% of his monthly expenditures, which is a surprisingly large percentage.[1]  Other expected expenses, such as the cost of a kennel the complaint alleges he is being forced to pay for, are omitted. Nor does the motion account for most ordinary daily expenses. It appears Roberts was summarizing, and listed certain categories as placeholders for a variety of expenses.  For example, he may have used "dog food" to refer to all costs of owning his service dog. But based on his representations about his income, the Court accepts that Roberts lacks the funds to pay the filing fee, and **GRANTS** his request to proceed IFP.

The IFP statute contemplates that granting leave to proceed IFP is a decision that can be revisited. *See* 28 U.S.C. § 1915(e)(2).  Roberts is therefore **ORDERED** to file a supplement to his IFP motion, giving a more complete account of his monthly expenses and identifying how he is able to afford the ordinary necessities of life, whether he pays for them or they are provided to him.  He must do this within **30 calendar days of the date this order is issued**.  If he fails to provide an adequate explanation, he risks revocation of his IFP status.

**TRO Motion**

**Documents, Service and Notice**

Defendant Veterans Village cannot yet have been served with process, because no summons has yet been issued.  But according to Roberts' briefing on the TRO, Roberts' counsel sent Veterans Village's counsel copies of the briefing by email.

The briefing consists of four documents: the TRO motion (Docket no. 2), a filing styled "<u>Amended</u> Declaration of Michael Roberts" (Docket no. 5), a declaration of attorney Bryan Pease (Docket no. 6), and a document styled "<u>Second Amended</u> Declaration of Michael Roberts" (Docket no. 7).  The Court understands the second amended Roberts declaration as being intended to replace both the original Roberts declaration (Docket no. 2 at 21–24)

---

[1] For example, the IFP motion says Roberts spends $150 to $200 per month on gasoline.  Bearing in mind the complaint's allegations that Roberts does not work, is disabled, and does not like to get out, it is surprising that he would be doing so much driving. Similarly, a figure of $150 to $200 per month for dog food seems inexplicably high, particularly for a dog Roberts has had with him for just over a month.

and the amended Roberts declaration (Docket no. 6). This order will treat the second amended declaration as the operative declaration, and refer to it simply as Roberts' declaration.

Excluding the amended declarations, the briefing consists of 64 pages. According to the documents labeled "certificates of service, Veterans Village and its counsel were first given notice of Roberts' intent to seek a TRO on the afternoon of March 15. The final document was not filed until 4:24 p.m. on March 16.

To prevent defense counsel from having to prepare and file an opposition in great haste and at significant expense, the Court by a separate order has relieved them of any obligation to do so until directed otherwise by the Court.

**Legal Standards**

TROs are for emergencies only. The high hurdle plaintiffs must clear to obtain the "reflect[s] the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 438 (1974). The TRO standard is the same as the preliminary injunction standard, with the additional requirement that the applicant show immediate relief is necessary. *See, e.g., Hunt v. Nat'l Broadcasting Co., Inc.*, 872 F.2d 289, 292 (9th Cir. 1989).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the alternative, the "sliding scale" approach can be used. Under this approach, a party seeking a preliminary injunction must show a combination of serious questions going to the merits, and must also show that the balance of hardships tips sharply in the movant's favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (holding that the sliding scale test remained valid even after *Winter*). A weaker showing on either of the two points can be outweighed by a stronger showing on the other. *Id*.

Delays in seeking relief are considered when determining whether preliminary injunctive relief should be granted. *See Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir.1993) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.") (internal quotation marks and citation omitted); *Lydo Enterprises v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir.1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief.")

**Factual Discussion**

The following facts are taken from the body of the briefing and from Roberts' declaration. Roberts has a semiprivate room at Veterans Village, a home for disabled veterans. He has a service dog, Arthur,[2] who both provides emotional assistance and helps Roberts with mobility. Beginning January 11, 2017, Veterans Village allowed Roberts to keep his service dog, but required that it be leashed at all times. Roberts was given notice of this requirement, and agreed to abide by it. (*See* TRO Motion, Exs. B and F.)

Soon after Arthur moved in, staff began having concerns about his behavior. Within a week, he menacingly charged at a staff member and resident, frightening them. The briefing cites case:

> The evening of 1/18/17, the Program Director (PD) met informally with resident [Roberts] following house meeting to address concerns regarding his lack of control over his emotional support dog, Arthur. The resident was informed that a staff person was frightened during our East side room sweeps today as Arthur charged the door when they opened it to enter.

(Roberts Decl., Ex. G (Docket no. 7 at 36).) The notes quote an excerpt from an email sent by the staff member:

> A model resident was assisting me with the rooms on the east side and we opened the door to room 411, saw that there was no dog in the crate . . . then a great dane charged at us and quite frankly, scared the crap out of us. The model resident was able to quickly shut the door just in time.

(*Id.*) The notes go on to say that Roberts was warned and reminded that Arthur needed to be leashed or crated at all times. He was told there would be no "commitments to change"

---

[2] Supporting documents give the dog's name as "Grayson," so apparently Roberts or someone else renamed him.

1  (*i.e.*, second chances) for perceived aggression from a dog, and that he needed to take "all precautions available to insure success with his animal." (*Id.*) According to the notes, Roberts said he appreciated the talk and informed the program director that he was working with a trainer. (*Id.*) An incident report (Roberts Decl., Ex. H) is consistent with the notes, and adds the detail that Arthur began to growl when Rushing entered the room.

At 12:30 a.m. on February 28,[3] a Veterans Village employee named Moses Rushing opened Roberts' room door and shined a flashlight in the room. According to Roberts' affidavit, Arthur jumped out of Roberts' bed and followed the flashlight. Rushing, seeing the dog, slammed the door, which then barked twice as an alert[4] to Roberts. (Roberts Decl., Docket no. 7, ¶ 7.) Roberts says he sent Arthur to his kennel, and Rushing then entered. Rushing asked whether Roberts had a USB memory stick that Rushing had given him to give to his roommate earlier in the evening.[5] He also said that Roberts had forgotten to leave his van keys at the desk,[6] and said he was going to move the van. (*Id.*)

After a hearing on March 1, Veterans Village employee Adam Moore told Roberts he had to get rid of Arthur because of the incident the night before. Roberts argued that Arthur was not a threat to anyone, and that Rushing's entry into his room was a violation of the home's anti-fraternization rule. Roberts submitted an appeal, which was denied. Since that time, he has been paying $50 per day to board Arthur.

Roberts says that since March 3, his symptoms have worsened significantly, and that he cannot afford to continue paying to board Arthur. His only other option, he says, is to leave Veterans Village and be homeless.

---

[3] Based on other allegations, it appears Roberts might mean 12:30 a.m. on March 1. He refers to a meeting on March 1 at which the incident "the midnight before" was discussed. (Roberts Decl., ¶ 8.)

[4] It isn't clear why Roberts calls this an "alert". Nothing in the briefing explains why the dog would need to alert Roberts to the presence of other people.

[5] The briefing says Rushing was trying to borrow a movie. It may be that the movie was stored on the USB stick, although this is not explained.

[6] The IFP motion says Roberts owns a 2002 Ford Explorer; it may be that this is the "van" Rushing was talking about.

Documents attached to the pleadings provide facts not mentioned in the body of the pleadings, and cast events in a very different light. First, Arthur is a young Great Dane that Roberts adopted from a Great Dane rescue center on January 11, 2017.[7] (Roberts Decl., Ex. E.) The adoption agreement specified that the dog was to be kept as a home companion and given the same considerations as a family member. (*Id.*, ¶ 3.) The agreement required Roberts was to provide the dog with a fenced enclosure at least 1000 square feet, and included the prominent provision: "**Under no circumstances is the dog routinely tethered as a means of confinement.**" (*Id.*, ¶ 11 (emphasis in original).) It also included warnings that the dog might have latent problems, including problems with its temperament. (*Id.* ¶ 9 and postscript below signature blocks.) Roberts never says he told the rescue organization he intended to keep Arthur as a service dog, or that Arthur would be living with him inside a group home where he needed to be kept restrained or confined at all times.

No document or information shows where Arthur was trained or who trained him as a service dog, but it seems that whoever did the training did not screen and select him for that purpose. In other words, it appears rather than selecting and screening a dog and then training him, the trainer trained a dog that Roberts had already adopted.

Arthur's size is not stated, but clearly he is a large dog. When he was neutered on September 30, 2016, when he was 9-month-old puppy, he already weighed 92 pounds. (Docket no. 7 at 27.) Since then he has likely grown considerably.

Although Roberts says a doctor prescribed a service dog for him, and that Arthur helps him with his mobility, the doctor's letter he attaches is merely a recommendation that a therapy dog could help Roberts' recovery from PTSD and substance abuse. (*Id.*, ¶ D.) The letter does not suggest that a service dog is a necessary accommodation for a disability, or for the reasons Roberts now says he needs a service dog. (Roberts Decl., ¶ 6.) Instead,

---

[7] The fact that Arthur is a Great Dane does disqualify him as a service dog. But the fact that he is as large as a human is relevant when considering the effect of his unruly behavior on Veterans Village staff and residents. Such a large dog would naturally be more of a threat when charging at people, as Arthur did, than a smaller animal would be. The fact that he is so large also means that asking people to tolerate being charged or nipped by him is a good deal more burdensome and unreasonable.

it acknowledges that Roberts told the doctor he wanted a "therapy dog," and that the doctor "support[s] Mr. Roberts' aspiration and believe[s] it would aid him in his recovery." (*Id.*) Roberts also attaches a Veterans Village form he completed on January 11 when he was seeking permission to keep Arthur in his room. (*Id.*, Ex. F.) On the form, he said Arthur helped him by relieving stress and anxiety; he mentioned nothing else, including assistance with mobility issues. (*Id.*)

Roberts may be entitled to a therapy animal, and the Court is not making a determination at this time whether he is or is not. But the documentary evidence he submitted does not fully support his stated reasons for needing a service or therapy dog.

The February 28 incident notes also include details not mentioned in the body of the briefing. (Docket no. 7 at 37.) According to those notes, when Rushing entered the room, Arthur came toward him. Rushing asked Roberts "more than once" to restrain the dog. Instead of getting out of bed, Roberts called to Arthur, who did not respond. According to the notes, Roberts did not get out of bed to restrain Arthur, but waited for Arthur to go to his crate, which he eventually did. Arthur also nipped Rushing's hand but did not break the skin. The notes show that in deciding to withdraw permission for Arthur to be in the house, staff considered the earlier incident, the fact that Roberts had committed to controlling his dog, and this second incident.

Roberts has also attached a copy of the house rules, including the anti-fraternization rule he referred to that he thinks Rushing violated. (Roberts Decl., Ex. B.) The anti-fraternization rule is not a privacy rule and does not forbid staff from entering residents' rooms. Instead, the rule prohibits relationships of an intimate nature between residents, staff, or volunteers; sexual activity between residents; or activity such as petting, kissing, or fondling between residents. (*Id.*, ¶ 4.) In fact, the briefing makes clear this is a group home where staff have access to residents' rooms and enter for a variety of reasons. (*See, e.g.*, Roberts Decl., Ex. A, ¶ 3 (agreement giving permission for Veterans Village employees or representatives to inspect residents' belongings "*at any time*" (emphasis in original).) Roberts does not appear to be claiming that Rushing was entering the room for illicit

purposes or that he mentioned the USB stick and needing Roberts' keys to move the van as a mere pretext.

For purposes of analysis, Court will accept that Roberts can establish several of the factors necessary to show eligibility for preliminary injunctive relief, including irreparable harm and urgency. Where his motion fails is that he does not establish a likelihood of success on the merits, so as to make a TRO appropriate under the *Winter* standard, or even "serious questions going to the merits" that could satisfy the sliding scale standard.

Under the various statutes Roberts relies on, and under analogous statutes, a disabled person has a right to reasonable accommodations. This order does not differentiate between the various statutes' requirements or between service animals, therapy animals and emotional support animals, because it makes no difference to the outcome. A reasonable accommodation may include a therapy dog or service dog. But it does not necessarily include an unrestricted right to keep the dog of one's choosing, and it does not include a right to *unreasonable* accommodations, such as refusing to keep a service dog under control, or keeping an aggressive animal. *See United States v. Gates-Chili Central Sch. Dist.*, 198 F. Supp. 3d 228, 234 (W.D. N.Y. 2016) (citing with approval Department of Justice interpretation that service animals must be under the control of their owners at all times); *Grider v. City & County of Denver*, 2011 WL 721279, at *5 and n.5 (D. Colo Feb. 23, 2011) (recognizing that rules intended to prevent aggressive dogs being kept as service animals serve are permissible). An analogous regulation, 28 C.F.R. § 35.136(b) makes clear that public entities may exclude service animals that are not housebroken or that are out of control and not effectively restrained. Section 35.136(d) also requires that "A service animal shall be under the control of its handler." The same regulation requires that service animals have a harness, leash, or other tether, unless the owner's disability prevents it or the tether would prevent the animal's carrying out its duties, in which case some other effective means of control must be used.

While the Court is not in a position to make definite factual findings, the pleadings do not suggest Roberts was denied a reasonable accommodation. Instead, it appears that

Roberts may have selected an unsuitable dog as his service animal, or that its training did not prepare it for life in a group home. And in any event, he failed to keep it under control as reasonably required by staff. The adoption agreement should have made clear to Roberts that Arthur could not be routinely confined, and that he might have behavioral problems. Roberts' briefing characterizes Arthur's behavior as normal and innocuous. (TRO Motion, ¶¶ 4.) But aggressive or antisocial behaviors such as nipping, charging, and barking at strangers are not part of the services Arthur provided to Roberts, and are not normal behavior for a well-trained service animal. *See, e.g.,* Rebecca J. Huss, *Canines on Campus: Companion Animals at Postsecondary Educational Institutions*, 77 Mo. L. Rev. 417, 471 (2012) (giving examples of service animal behavior that merit exclusion of the animal from university campuses, either immediately or after a review). Roberts gives no reason why Veterans Village should be required to tolerate them. In addition, the rule requiring that service animals be kept under control at all times is a reasonable one. Exempting Roberts from that rule is not a reasonable accommodation.

The length of time Roberts has had Arthur also plays a factor. Although he describes Arthur as his best friend, the two have not lived together long. From the time Roberts adopted Arthur until the time Roberts sent him out of town to be boarded, less than two months passed. And of that two months, Arthur was being trained, and therefore presumably not living with Roberts, for three weeks. Although the Court does not question Roberts' affection for his dog, Arthur is not uniquely qualified to serve as Roberts' service animal. *Compare Sak v. City of Aurelia, Iowa*, 832 F. Supp. 2d 1026, 1044 (N. D. Iowa 2011) (holding that depriving owner of his service dog that had been individually trained him over the course of two years would result in significant loss and difficulty).

/ / /
/ / /
/ / /
/ / /
/ / /

**Conclusion and Order**

The TRO is **DENIED**. The Clerk is directed to issue a summons. If Roberts wishes to file a renewed request for preliminary injunctive relief, he should do so after Veterans Village has been served with process.

**IT IS SO ORDERED**.

DATED: March 20, 2017

*[signature]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge